UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SEALED**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Mag. Judge Case No. MJ04-M-277JLA |
| ) | |
| BRADFORD C. BLEIDT, ) | |
| Defendant ) | |

## AFFIDAVIT OF SPECIAL AGENT DENNIS REGAN

I, Dennis Regan, Special Agent, Federal Bureau of Investigation, being duly sworn, upon my oath depose and state:

1. I have participated in an investigation of Bradford C. Bleidt ("Bleidt") regarding allegations of mail, wire and securities fraud, among other things. The investigation is ongoing. The information set forth in this affidavit is based on the evidence obtained to date.

2. Federal and state investigators have amassed evidence which establishes that Bleidt knowingly and fraudulently engaged in a scheme to defraud approximately 140 persons of more than $10 million dollars, and in furtherance of that scheme he caused the United States Mails to be used, as described in more detail below:

3. For more than ten years, Bleidt was the president and owner of Allocation Plus Asset Management Company, Inc. ("APAM"), and Financial Perspectives Planning Services, Inc. ("FPPS"). APAM has been registered with the Securities and Exchange

**DOCKETED**

Commission ("SEC") as an investment advisor since March 1, 1994. FPPS has been registered with the SEC as an investment advisor since April 28, 1986.

4. Beginning in or about the mid-1980's, and continuing until on or about November 12, 2004, Bleidt devised and executed a scheme to defraud customers of his investment advisory businesses. The scheme consisted of obtaining funds from customers purportedly for the purpose of investing those funds through APAM in a variety of legitimate securities instruments, including money market funds and mutual funds, but instead using the funds for Bleidt's personal and business purposes. In order to further his fraudulent scheme, Bleidt periodically issued account statements to customers which falsely stated that their funds had been invested in legitimate securities investments, and set forth a false value for those purported investments. Each such account statement was false because the funds had not been invested as Bleidt represented, but instead had been used for his personal and business purposes. To further conceal his fraudulent scheme, Bleidt provided some customers with periodic payments which he purported to be annuity payments. When customers occasionally requested the return of invested funds, Bleidt would use funds fraudulently obtained from other customers to pay them. By his scheme, Bleidt defrauded approximately 140 investors of at least $10 million.

5. On or before November 11, 2004, Bleidt made audiotaped recordings in which he described the foregoing fraudulent scheme and stated that he had engaged in it over the past 15-20 years. Bleidt caused those tape recordings to be sent to several employees, family members and the Securities and Exchange Commission Office in Boston.

6. I have listened to nine such tape recordings. The following are excerpts of those recordings:

> I am the owner of the two security exchange commission registrations Financial Perspectives and Allocations Plus Management. We're over at 205 Portland Street in Boston downtown and . . . I am reporting a serious, serious breach of professional conduct and just criminal behavior. I am reporting myself. Over the last twenty years almost, I have stolen tens of millions of dollars from clients through Allocation Plus Management Corporation.
>
> I am guilty of some very hideous crimes. I've been stealing clients' monies for roughly 20 years. And we're talking about tens and tens of millions of dollars.
>
> I have committed a terrible terrible crime to many, many people. I've stolen tens, tens and millions of dollars over the last twenty years from clients.
>
> What I basically did, is that when I would get a new client I would roll their, I would take their money, have it payable to Allocation Plus Asset Management Corporation and deposit it in a Sovereign Bank account of which I would set up payments for the first and the fifteenth of the month or anytime the client would call and request money I always had enough cash flow that I was able to cover those demands, and it is today on this

Thursday, a day of reckoning because there is a client that needs a million and a half dollars wired into their account that was supposed to be there this morning and obviously it is not going to be there this morning because the money is gone. I stole it.

I would prepare monthly statements to send to clients and we are talking about close to 100 clients at least so this is a major, major, major situation and its tragic and I am so sorry and guilty.

The monthly statements that I was generating are fraudulent. The monies don't exist in those statements. It's a great big Ponzi scheme.

What I would end up doing is just signing up new clients and having the checks made payable to APAM and deposited in a Sovereign Bank account which the statements actually came to the house under my name.

I would be collecting investment dollars and deposits made payable to APAM and deposit them in a Sovereign Bank account. And then embezzling them after that. Also funding the company and doing whatever is necessary.

The monthly statements that I do are fake, they're false, there is no money in them. They're fake statements that you know people bought. I do direct deposits on the first and fifteenth of every month, for clients so they never would assume, you know, there would ever be a problem and if people needed money I was always able to come up with the money to give them, like if they needed $20,000 I was always, it was a big Ponzi scheme, is what it was and it has all blown up now.

I've been doing, stealing money for nearly two decades and it has just gotten huge. Those monthly statements were the instrument that allowed me to carry on a facade and a

4

> sham and a Ponzi scheme of a fairly large proportion.
>
> There are three file boxes on wheels in my office. They represent the clients that I've stolen money from. This client list included with them of all the clients in its current statements. Most of the money represents owners' monthly statements, it doesn't exist. Been generating monthly statements to cover fact that the money's gone.
>
> The statements that are in there are accurate but they also represent the principal that was stolen but also fictitious histories of trades and investments and allocations you know that, you know, performance was pretty good, theoretically I guess, but they obviously was fictitious you know so I really don't know how that gets valued but the addition of the sums all those statements I haven't even had the guts to look at that. It's got to be well over 20 million cumulative. This was done over a two decade period so it's just built on itself and it's just horrible.

7. On or about November 11, 2004, the Securities and Exchange Commission received a tape recording from Bleidt in which he admitted to the above scheme. In response, and pursuant to its regulatory examination authority, the SEC sent investigators to the offices of APAM and FPPS. The SEC investigators identified the file drawers which Bleidt described in his tape recordings. They located the client documents he described, including the false account statements. The SEC identified files representing approximately 140 persons and/or entities who had given funds to Bleidt/APAM for investment. The most recent portfolio statements contained in their files reflect

5

an alleged portfolio value for those 140 clients of more than $45 million.

8. Also in response to the information provided in Bleidt's taped statements, the SEC has issued subpoenas to Sovereign Bank for bank account records. To date, they have received some records for the APAM account identified by Bleidt. That account reflects that statements were sent to Bleidt at his personal residence.

9. Attached is a memorandum prepared by SEC Branch Chief Philip C. Koski and Staff Accountant Anthony C. Jordan, dated 11/19/04. That memorandum states that the SEC conducted a review of recent APAM Sovereign Bank account statements and the current balance on that account, which is now frozen, is $22,316. According to the SEC memorandum, a review was conducted of the account records and, consistent with Bleidt's statements, those records reflect that Bleidt deposited investor/victim checks into that account, that such funds were not used for the purchase of legitimate security investments, and that Bleidt instead used the funds for personal and business purposes.

10. On November 18, 2004, Special Agents of the FBI interviewed 15 of the persons who gave funds to Bleidt and APAM for investment. Most of those persons were included in Bleidt's files as persons from whom he had stolen and embezzled money. Each of the persons interviewed provided similar information

concerning their dealings with Bleidt. Each provided funds to Bleidt for the purpose of investing in legitimate securities instruments through Bleidt's APAM business. Most received regular correspondence and "Portfolio Reviews," (i.e. account statements) from Bleidt. Most of the persons interviewed provided investigators with copies of materials they had received from Bleidt. The correspondence and portfolio reviews were printed using APAM's name and letterhead. They purported to describe each investor's portfolio, with detailed information concerning securities purchased, sold and the value of those held in the account. Each of the persons interviewed who received correspondence and account statements from Bleidt and APAM received them via the U.S. Mail. Several persons provided investigators with original envelopes in which they had received those items. Since the fraud was uncovered, several of those interviewed had contacted the broker-dealer which they had been led to believe by Bleidt held their investments. Each of those who contacted that broker-dealer were told that Bleidt had not opened accounts in their names and that the broker-dealer held no such funds.

11. Special Agents of the FBI have interviewed an employee who worked directly for Bleidt. According to this employee, Bleidt routinely instructed this employee to mail correspondence and account statements to customers.

12. In or about October 2004, Bleidt caused a "Third Quarter Portfolio Review" to be mailed from the APAM offices in Boston, MA to one of Bleidt's customers in Portsmouth, NH.

13. In or about October 2004, Bleidt caused a "Third Quarter Portfolio Review" to be mailed from the APAM offices in Boston, MA to one of Bleidt's customers in Newtonville, MA.

14. The persons interviewed represented that they gave a total of more than $5 million to Bleidt to invest on their behalf.

_____
DENNIS REGAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to before me this 19 day of November 2004.

_____
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Boston District Office
73 Tremont St., 6th Floor
Boston, MA 02108
Telecopier: (617) 573-8900



# Memo

| | |
|---|---|
| **To:** | The File |
| **From:** | Philip C. Koski, Branch Chief, and Anthony C. Jordan, Staff Accountant |
| **CC:** | Martin F. Healey, Assistant District Administrator |
| **Date:** | 11/19/2004 |
| **Re:** | Review of August 2004 Activity in the '6545 Account |

Bleidt controlled an account at Sovereign Bank held in the name of "APAM Allocation Plus Management Inc c/o Bradford C. Bleidt," account no. 61000016545 (the "'6545 Account"). The '6545 Account appears to be the primary account Bleidt most recently used to embezzle investor funds. The address on the '6545 Account was 8 Nortons Pt., Manchester, MA 01944-1432. Bleidt is the only authorized signatory on the '6545 Account. The current balance of the account, which is now frozen, is $22,316.

Examination of records obtained from Sovereign concerning the '6545 Account reveal that Bleidt was depositing investor checks, as well as receiving deposits from investors in the form of wire transfers, and making payments out of the account in the form of wires, checks, "internet payments," and miscellaneous debits. Several of the deposits and payments involved other entities with which Bleidt was affiliated, including Shared Visions, FPPS Management Co., and Financial Perspectives Planning Services. In addition, records reflect transfers to a Fleet Bank account held by Bleidt.

In order to provide a more detailed snapshot of his practices, we analyzed records from the month of August 2004 in the '6545 Account and summarized those findings below.

During the month of August 2004, wires or checks from at least four Bleidt investors totaling $340,000 were deposited into the '6545 Account. There is no evidence of any payments out of the account to any brokerage firms to reflect the actual investment of these funds. Rather, Bleidt used the funds to make payments to various parties, including himself, entities with which he was affiliated, and some clients.

For example, on Friday, August 6, 2004, Bleidt deposited two investor checks – one for $140,000 from one investor and the other for $50,000 from another investor (collectively, the "August 6 Investors") – into the '6545 Account, giving the account a total balance of $220,325. Instead of investing the funds, the next business day – Monday, August 9, 2004 – Bleidt began

drawing down on the account, wiring six payments totaling $87,768 to various parties, including $24,000 to Shared Visions, $26,000 to FPPS Management Co., and $30,368 for payments on to parties unrelated to the August 6 Investors.

On August 10, 2004, Bleidt continued to draw down on the '6545 Account, including a $48,000 payment to his affiliate, Shared Visions, and reached a negative balance. On August 11, 2004, Bleidt then wired back $40,000 from Shared Visions to cover the negative balance. On August 12, 2004, Bleidt deposited a check in the amount of $50,000 from another investor (the "August 12 Investor"). The next day, he wired $10,000 to his personal account, as well $26,000 back to Shared Visions. He continued to draw down on the account by making various payments without investing any of the funds of the August 12 Investor.

On August 19, 2004, Bleidt deposited $20,000 from an investor. That same day, Bleidt wired $20,000 out of the account to another client.