UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 NOV 25  P 2: 55

UNITED STATES

V.

BRADFORD C. BLEIDT
Defendant

CRIMINAL NO. 05-10144-WGY

U.S. DISTRICT COURT
DISTRICT OF MASS.

## SENTENCING MEMORANDUM

The defendant, Bradford C. Bleidt, has entered a Rule 11(c)(i)(C) plea of guilty to each of the 115 counts of 18 USC 1341 mail fraud and 1 count of 18 USC 1957 money laundering, i.e. engaging in monetary transaction with proceeds from an unlawful mail fraud activity. He has agreed to a sentence of 135 months of imprisonment.

In doing so, he has acknowledged his guilt, the scope of his fraud, and the strength of the evidence against him. He has thereby sought to spare the Court and the government the time and expense of a lengthy trial, as well as the emotional burden on the victims who would otherwise be required to live out the details and circumstances of their losses in public testimony.

In addition to the above cited reasons, the purpose of this memorandum is to outline a number of other reasons why this Court should accept the plea agreement for a sentence of 135 months, or 11 years and 3 months of confinement.

The defendant is now fifty one years and eight months old. He will be days short of sixty three years old at the conclusion of his sentence. He has no prior criminal conviction or record of any moment. He has had a problem with alcohol for which he has had some treatment and is amenable to further treatment. Though the fraud here grew widespread and long term it was the product of essentially aberrant personal conduct. The defendant did not recruit to the fraud any other financial planners in his employ or any of his other subordinates.

The defendant's misappropriation trail started in the mid-1980s with a conversion of client funds he then used to repay a prior substantial personal loan he had received from friends. The essential reason was financial pressure from family and other expenses in his personal life as

he started to build a financial planning business. (Pre-Sentence Report, par. 90) The defendant had started his financial planning firm in the mid-eighties. (Pre-Sentence Report, par. 91). From a modest beginning it grew to 85 million under management in November 2004 (Exhibit "A", p. 2, par. 1). As he sought to grow his business, along the way he developed a habit of converting client funds to meet pressing payroll or other expansion needs. The fraud grew greatly commencing in 2001 when three of the best financial planners in his company's employ left, causing a 60% loss in revenue. He sought to balance this loss by expanding the scope of the fraud to keep his companies financially afloat. Some 3.5 million dollars was consumed in this effort. His fraud later peaked in what can only be judged as an ill conceived effort to restore his misappropriations of client funds through the purchase of a radio station for 10 million dollars. The deal proved to be a losing, ongoing financial disaster from the outset. It eventually consumed fifteen million dollars.

The Ponzi Scheme aspect of the client's accounts he had personally acquired and managed became exposed with his inability to meet an October, 2004 1.5 million dollar redemption of funds request from a single investor. Once his fraudulent scheme effectively collapsed with that October, 2004 call for redemption, the defendant exhibited both profound guilt and remorse. That guilt and remorse were demonstrated when, bolstered by liquor and drugs, he attempted suicide on November 11,2004, only to instead fracture several vertebrae in his neck requiring surgical fusion of two discs, with resulting partial paralysis of his arms, which the defendant has worked to cure. (Pre-Sentence Report, par. 106, 108; Exhibit "B", Incident Report, Manchester Police Dept. 11/11//04) His guilt and remorse were further demonstrated by the tapes he sent his employees and family members confessing the enormity of his fraud and acknowledging the tragedy it represented for his victims. At the same time, he tried to give some concrete expression to that remorse by mailing tapes to the Securities and Exchange Commission and other entities confessing his crimes and advising the SEC where the records which reflected the fraud could be found. (Pre-Sentence Report, par. 31)

The defendant has attempted from the outset to aid to cooperate with authorities (Exhibit "C", p. 6) including in their efforts to recover funds on behalf of the victims of his fraud. He did so by volunteering,[1] through present counsel, to participate by interview and deposition with

---

[1] Defendant, through present counsel, had earlier volunteered cooperation to the U.S. Attorney's Office. The offer was declined for the stated reason that in the government's view the defendant's statements on tape that no one else

representatives of the SEC and the Receiver[2] wherein he answered all inquiries concerning the scope and methods of his fraud. He did so without seeking the formal protection of any immunity from any state or federal sovereign. His cooperation in that regard has been judged by the Receiver to be of material assistance in the Receiver's efforts on behalf of the victims to achieve financial settlement with third party brokerage firms and banks based upon potential claims of their lack of adequate supervision and oversight of the defendant and/or willful blindness or otherwise negligent conduct in the face of telltale signs of his fraud (Exhibit "D", p. 2, par. 9). He continues to be available to the entities for further inquiry or testimony.

As is evident from the Pre-Sentence Report, the defendant has paid a heavy personal price in terms of total continuing estrangement of his three sons, as well as divorce from his wife. (Pre-Sentence Report, pars. 93, 98) He did not acquire any significant personal assets from the fruits of his scheme. The defendant lived well, but did not live a financially flamboyant lifestyle. All of his personal assets have been seized. The total net cash from his assets and companies appears to be $293,217.74 (Exhibit "D", p. 7, par. 21). The total amount realized from sale of all of his personal tangible property amounted to $56,004.31 (Exhibit "E", p. 8, par. 20). The FBI, SEC and the IRS, all of whom acted to trace the funds, have indicated they do not believe there is any hidden cash hoard.

Finally, it appears that the 11 year 3 month sentence agreed to by the defendant is at the upper end of prior fraud dispositions in this District Court[3].

---

was involved in his fraudulent scheme foreclosed his usefulness in the context of 18 USC Rule 35(b) and USSG 5K1.1.

[2] A Receiver, with the law firm of Nixon Peabody as counsel, was appointed by Judge Gertner on November 18 and 22 to take control of the defendant's assets and property in a pending civil suit brought against the defendant, i.e. the Securities and Exchange Commission v. Bradford c. Bleidt, USSC Cr. No. 04-12415, wherein the SEC sought, among other relief, disgorgement of the defendant's "ill gotten gains" and "Prejudgment interest" (See Complaint therein and Exhibit "A" hereto, p. 1).

[3] U.S. v. Denis Morin, Cr. No. 01-40011 NMG, mail fraud, 10 million, 120 months
U.S. v. Nancy J. Cheal, Cr. No. 01-10076 RWZ, mail fraud, 3.3 million, 87 months
U.S. v. Jamie Edelkind, Cr. No. 04-10066 MKL, bank fraud, 3.2 million, 60 months
U.S. v. Peter V. Maggio III, Cr. No. 01-10386 RWZ, mail fraud, 2.8 million, 51 months
U.S. v. Dennis R. Ferullo, Cr. No. 01 -10386 RWZ, mail fraud, 2.8 million, 51 months
U.S. v. Leroy Anthony Sallee, Cr. No. 02-10242 PBS, mail fraud, 3.5 million, 48 months
U.S. v. Buck R. Sheldon, Cr. No. 01-10055 WGY, mail fraud, 5-10 million, 41 months USSG 5K1.1 cooperation
U.S. v. Morris Goldings, Cr. No. 01-10433 WGY, mail fraud, 16.2 million, 36 months, USSG 5k1.1 cooperation
U.S. v. Elliot J. Feiner, Cr. No. 04-10180 RWZ, mail fraud, 5.6 million, 15 months, USSG 5k1.1 cooperation
For comparison see U.S v. Bernard Ebbers, USDC NY, accounting fraud, 11 billion, 2.5 million victim, 300 months, Wall Street Journal, July 14, 2005, p. 1. (Exhibit "F")

For the foregoing reasons, it is submitted the agreed to sentence of 11 years and 3 months is a fair and just sentence and should be accepted by this Court.

Dated: November 23, 2005

Respectfully submitted

Edward J. Lee

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of November, 2005, I served a true and correct copy of the foregoing "Sentencing Memorandum" upon counsel for the government by delivering a copy of the same to the Office of AUSA Mark Balthazard, United States Attorney's Office, United States Courthouse, 1 Courthouse Way, Boston, MA 02210.

Edward J. Lee

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| .SECURITIES AND EXCHANGE COMMISSION, )<br><br>      Plaintiff, )<br><br>      vs. )<br><br>BRADFORD C. BLEIDT and )<br>ALLOCATION PLUS ASSET MANAGEMENT )<br>COMPANY, INC., )<br><br>      Defendants. )<br> | Civil Action No. 04-12415-NG |

## FIRST INTERIM APPLICATION OF NIXON PEABODY LLP, COUNSEL FOR THE RECEIVER FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

Pursuant to this Court's orders dated November 18, 2004 and November 22, 2004 (the "Appointment Order"), appointing David A. Vicinanzo Receiver in the above-captioned case, Nixon Peabody LLP, ("NP") counsel to the Receiver, hereby submits this First Interim Application for Compensation and Reimbursement of Expenses (the "Application"). Through this Application, NP seeks entry of an order (a) awarding Nixon Peabody interim compensation totaling $966,207.02, representing (i) $958,451.30 for actual and necessary legal services rendered to the receiver for the period between November 18, 2004 through July 31, 2005 (the "Application Period"), and (ii) $7,755.72 for reimbursement of actual and necessary expenses incurred by NP on behalf of the receiver during the Application Period; and (b) authorizing the payment of NP's allowed fees and expenses on an interim basis from estate assets when sufficient funds become available to pay those allowed fees and expenses. Although there are presently insufficient funds in these estates to pay all of the compensation sought in this

EXHIBIT "A"

- 2 -

Application, NP and the Receiver seek interim allowance of those fees and expenses at this time

so that the Court, the defrauded investors, and other parties-in-interest will be aware of the full

scope of the services NP has provided to the Receiver in this case to date and the estates'

obligation to compensate NP for that substantial work. In support of this Application, NP and

the Receiver respectfully state as follows:

## PROCEDURAL AND FACTUAL BACKGROUND

### A.   The Receivership Entities.

1.    Allocation Plus Asset Management Company, Inc. ("APAM') was an investment

advisory and asset management firm. Prior to the commencement of the above-captioned civil

action, APAM had approximately $85 million under management and, according to its form

ADV, was registered with the Securities and Exchange Commission (the "Commission").

Financial Perspectives Planning Services, Inc. ("FPPS") was also an investment advisory firm

specializing in financial planning. According to its form ADV, it too was registered with the

Commission as an investment advisor. FP Insurance Agency and Financial Perspectives

Management Company are affiliates of APAM and FPPS.

2.    From approximately February, 2004 through November, 2004, APAM and FPPS

provided investment advisory and asset management services through individual registered

representatives and investment advisor representatives registered with Winslow, Evans and

Crocker ("WEC"), a broker-dealer registered with the Commission. Prior to that period,

APAM's and FPPS's representatives were registered with Detwiler, Mitchell, Fenton & Graves,

Inc. ("Detwiler") from October, 2001 to February, 2004 and Commonwealth Financial Network

("Commonwealth") from January, 1991 to October, 2001. All three brokerage firms are

Commission-registered broker-dealers and members of the National Association of Securities

- 19 -

## PRAYERS FOR RELIEF

WHEREFORE, Nixon Peabody LLP respectfully requests that this Court enter an Order:

A.  Awarding Nixon Peabody interim compensation totaling $966,207.02
    representing: (i) $958,451.30 for actual and necessary legal services rendered to
    the Receiver between November 18, 2004 and July 31, 2005; and (ii) $7,755.72
    for reimbursement of actual and necessary expenses incurred by Nixon Peabody
    on behalf of the Receiver, between November 18, 2004 and July 31, 2005.

B.  Authorizing the payment of all allowed fees and expenses from estate funds when
    sufficient funds become available to pay those allowed fees and expenses; and

C.  Granting such offer and further relief as is deemed appropriate and just.

Respectfully submitted,

DAVID A. VICINANZO, RECEIVER

By his attorneys,

September 21, 2005

/s/Kevin M. Fitzgerald
Kevin M. Fitzgerald (admitted pro hac vice)
Francis C. Morrissey (BBO #567589)
Nixon Peabody LLP
100 Summer Street
(617) 345-1000

# SEALED   DOCUMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| SECURITIES and EXCHANGE COMMISSION, | ) | C.A. No. 04-12415 |
| PLAINTIFF | ) | Courtroom No. 2 |
| VS. | ) | One Courthouse Way |
| BRADFORD C. BLEIDT, | ) | Boston, MA  02210 |
| DEFENDANT | ) | |


MAY 12, 2005

3:01 p.m.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


Valerie A. O'Hara

Official Court Reporter

75551c04-f6bf-41f5-82d7-38bcbc0ae20f

EXHIBIT "Q"

Page 2

```
 1   A P P E A R A N C E S:

 2        Securities and Exchange Commission, by SILVESTRE A.
      FONTES, ESQ., and MICHELE T. PERILLO, ATTORNEY, 73 Tremont
 3    Street, Boston, Massachusetts  02108; for the Plaintiffs;

 4        Nixon Peabody, LLP, by KEVIN M. FITZGERALD, ESQ., and
      FRANCIS MORRISSEY, ESQ., 889 Elm Street, Manchester,
 5    New Hampshire  03101; for the Receiver;

 6        GREGORY D. OBERHAUSER, ESQ., 10 George Street,
      Suite 200, Gateway Center Building, Lowell, Massachusetts;
 7    for the Defendant.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon.  Be seated.  This is
3    the receiver's motion with respect to attorneys fees?

4          MR. FONTES:  It's actually, your Honor, a joint
5    motion of the commission and the receiver.  I can take the
6    first shot at it?

7          THE COURT:  Okay.

8          MR. FONTES:  Basically back in March, I believe,
9    Defendant Bleidt filed a motion seeking relief of some of
10   the frozen funds.  It's not clear in the motion what exactly
11   he's seeking frozen, but basically the motion asks for
12   unfreezing of the funds that your Honor has frozen.

13         THE COURT:  So that he could hire a lawyer?

14         MR. FONTES:  So that he could hire an attorney,
15   and we respectfully that that order at a minimum requires
16   clarification.

17         THE COURT:  I thought about that, and I looked at
18   SEC vs. Achievement Corporation which was a situation in
19   which the Court released funds after there had been a
20   finding that the funds had been obtained fraudulently, so
21   the question is, the capacity to release funds when there
22   has only been a preliminary finding not mitigated on an
23   adversary basis concerning funds, and I wondered whether a
24   compromise here would be just to release the $12,000 from
25   Mr. Bleidt's personal account as a preliminary matter.

Page 6

1   from the point of view of the receivership to corporate with

2   the Order rather than appeal it, but I think our position

3   today is to object to the entry of the Order.

4            THE COURT:  Okay.

5            MR. FONTES:  Just so it's clear, your Honor, that

6   is our initial position, if you will.  Your Honor, we object

7   to the Order that was entered on Friday, just so the record

8   is clear.

9            THE COURT:  I think that Order ought to have been

10  amended, and it ought to be more clear.  It is a vicious

11  cycle.  On the other hand, I entered preliminary findings on

12  the basis of not an adversary process on an emergency basis.

13  The SEC got Mr. Bleidt's cooperation.  It was a cooperation

14  that was without the advice of counsel, which seemed to me

15  to be grossly unfair, important to the SEC, took advantage

16  of it, appropriately took advantage of it but still not

17  fair, both for the Court's purposes in terms of an orderly

18  processing of the case and for the issue of fairness

19  Mr. Bleidt needs counsel.

20           The question is how do you give him counsel

21  without running down the very assets which should be the

22  subject of the litigation, and I think that the $12,000 in

23  the personal accounts is an appropriate compromise of his

24  need to defend himself, the Court's need to have counsel

25  defend him in an orderly way, counsel needs to be paid and

```
                                                      Page 10
 1
 2
 3
 4
 5                    C E R T I F I C A T E
 6
 7    UNITED STATES DISTRICT COURT )
 8    DISTRICT OF MASSACHUSETTS    )
 9    CITY OF BOSTON               )
10
11          I, Valerie A. O'Hara, Registered Professional
12    Reporter, do hereby certify that the foregoing transcript
13    was recorded by me stenographically at the time and place
14    aforesaid in No. 04-12415, In Re:  SEC vs. BRADFORD C.
15    BLEIDT and thereafter by me reduced to typewriting and is a
16    true and accurate record of the proceedings.
17          In witness whereof, I have hereunto set my hand
18    this _____ day of _____, 2005.
19
20
21
22                         _____
23                         VALERIE A. O'HARA
24                         REGISTERED PROFESSIONAL REPORTER
25
```

NUV 15 2005 10:34HM ... UBERKHHUSEK LHW OFFICE      Filed 11/29/2005      Page 1 of 4      P. 2
Case 1:05-cr-10144-WGY   Document 28-5   Filed 11/29/2005   Page 1 of 4
Case 1:04-cv-12415-NG   Document 80-1   Filed 11/14/2005   Page 1 of 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION, )

       Plaintiff,

vs.

       Civil Action No. 04-12415-NG

BRADFORD C. BLEIDT and
ALLOCATION PLUS ASSET MANAGEMENT
COMPANY, INC.

       Defendants.

## RECEIVER'S THIRD INTERIM REPORT

In accordance with this Court's Orders dated November 22, 2004 (the "Appointment

Order") and October 18, 2005, David A. Vicinanzo, the Court-appointed receiver (the

"Receiver") of defendants, Bradford C. Bleidt ("Bleidt") and Allocation Plus Asset Management

Company, Inc. ("APAM") and his counsel, Nixon Peabody LLP ("Nixon Peabody") hereby

submit their Third Interim Report.

## INTRODUCTION AND OVERVIEW

1.     This Third Interim Report provides a summary of the Receiver's and his counsel,

Nixon Peabody's activities since the Receiver's Second Report was filed with the Court on July

15, 2005 (the "Third Report Period") and was served on defrauded investors and other parties-in-

interest shortly thereafter. The Report also brings current the Receiver's preliminary conclusions

and recommendations as set forth in the Third Report.

*EXHIBIT* ***D***

9.    To facilitate the conclusion of a stipulation to judgment and to further assist the
Receiver and the SEC in understanding the details of Bleidt's fraud, counsel for the Receiver and
the SEC interviewed and deposed Bleidt over a period of 3 days following entry of the Plea
Agreement. This was the first opportunity since the opening of this case in November of 2004 to
directly question Bleidt concerning the details of his activities including the modalities he
employed to perpetrate his crimes. Bleidt's testimony in this respect has been of material
assistance to the Receiver, inter alia, in his ongoing effort to evaluate and pursue potential
recoveries for these estates.

## B.    The Court's and the Federal Communication Commission Approval of the WBIX Rescission Agreement.

10.    During the Third Report Period, the Receiver made substantial progress towards
liquidating the principal asset in these estates – Bleidt's indirect ownership interest in WBIX
Corp. f/k/a Langer Broadcasting Corp.

11.    As detailed in the Receiver's previous reports, WBIX Corp. operates an AM radio
broadcasting business under the call letters WBIX 1060 AM (the "Station") from separate tower
sites located in Ashland, Massachusetts and Framingham, Massachusetts.

12.    On September 21, 2005, the Receiver and Langer entered into definitive
agreement to rescind Bleidt and PBI's purchase of the WBIX stock (the "Rescission
Agreement").

13.    In essence, the rescission transaction contemplated that the stock in WBIX Corp.
shall be returned to Langer in exchange for:

- Aggregate cash payments from Langer to the Receiver in the amount of $1,500,000;
- Langer's assumption of pre-receivership station liabilities of $433,000;

M126536.1                                    -4-

and Langer; (c) his motion to approve the rescission agreement; and (d) his first interim fee application. In addition, during that period, the Receiver continued to maintain a web page at http://extranet30.nixonpeabody.com. The Receiver's web page, among other things, contains contact information for the Receiver, the SEC and the United States Attorney, as well as links to the Appointment Order, the First and Second Status Reports and other important orders and pleadings in this case.

## THE RECEIVERSHIP ESTATES' CASH POSITION AS OF THE APPOINTMENT DATE AND CURRENT FINANCIAL CONDITION

21. To date, the Receiver has recovered cash in the amount of $566,779.02 and has expended funds in the amount of $273,581.78 in connection with the wind-up of APAM's and FPPS's businesses. The substantial majority of those expenditures ($271,913.03) were for wages, commissions, benefits and withholding taxes due to APAM's, FPPS's and their affiliates' employees. In accordance with paragraph 15 of the Appointment Order, a detailed accounting of the funds in the Receiver's possession is attached hereto as Exhibit B.

## PROFESSIONAL FEES INCURRED BY THE RECEIVER.

22. Due to the nature and exigencies of this case, the legal fees and expenses incurred by the Receiver to date have been substantial. The Receiver was required to employ counsel that are experienced and familiar with litigation, securities, bankruptcy and insolvency, communications, tax, and employment law and a host of other practice areas.

23. On September 21, 2005 Nixon Peabody, counsel for the Receiver, filed its first interim application for compensation and reimbursement of expenses (the "First Application"). As detailed in the First Application, during the period from November 18, 2004 through July 31, 2005, Nixon Peabody spent a total of 2,857.9 hours providing legal services to these estates and is owed $966,207 for that work. The First Application contains a detailed narrative

M126536.1                    -7-

report of all of the professional services performed by Nixon Peabody and is available to investors, creditors and other parties-in-interest upon request.

24. Although Nixon Peabody filed its First Application in September, it has deferred requesting a hearing on the application until the rescission transaction has closed and matters involving a proposed broker-dealer settlement have been determined.

25. For the period from August 2, 2005 through October 31, 2005, Nixon Peabody spent a total of 717.80 hours providing legal services to these estates. That work will be the subject matter of subsequent fee applications filed with the Court. In accordance with the Appointment Order, invoices detailing all of the time and expenses incurred during that period and the nature of the work performed will be provided to the SEC.

November 14, 2005                     Respectfully submitted,

                                      DAVID A. VICINANZO, RECEIVER

                                      /s/Kevin M. Fitzgerald
                                      Kevin M. Fitzgerald (admitted pro hac vice)
                                      Francis C. Morrissey (BBO #567589)
                                      Nixon Peabody LLP
                                      100 Summer Street
                                      Boston, MA 02110
                                      (617) 345-1000

## Certificate of Service

I, Kevin M. Fitzgerald, hereby certify that on November 14, 2005, a copy of the Receiver's Third Interim Report has been served upon the parties by electronic filing service and a copy mailed via first class prepaid mail to:

Richard L. Gemma
MacAdams & Wieck
101 Dyer Street – Suite 400
Providence, RI 02903

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                                )
SECURITIES AND EXCHANGE COMMISSION, )
                                                )
          Plaintiff,                            )
                                                )
vs.                                             )    Civil Action No. 04-12415-NG
                                                )
BRADFORD C. BLEIDT and                          )
ALLOCATION PLUS ASSET MANAGEMENT                )
COMPANY, INC.                                   )
                                                )
          Defendants.                           )
                                                )
```

## RECEIVER'S SECOND INTERIM REPORT

In accordance with this Court's Orders dated November 22, 2004 and May 12, 2005 (the "Appointment Date" and "Appointment and Order," respectively), David A. Vicinanzo, the Court-appointed receiver (the "Receiver") of defendants, Bradford C. Bleidt ("Bleidt") and Allocation Plus Asset Management Company, Inc. ("APAM") and his counsel, Nixon Peabody LLP ("Nixon Peabody") hereby submit their Second Interim Report.

### INTRODUCTION AND OVERVIEW

1.       This Second Interim Report provides a detailed summary of the Receiver's and his counsel, Nixon Peabody's activities since the Receiver's Initial Report was filed with the Court on February 22, 2005 (the "Second Report Period") and was served on defrauded investors and other parties-in-interest shortly thereafter. The Report also brings current the Receiver's preliminary conclusions and recommendations set forth in the Initial Report.

EXHIBIT "E"

connection with the recession agreement will be finalized shortly and that he will seek Court approval of the agreement by the end of this month.

20.    Liquidation of Bleidt's Other Personal Property. During the Second Report Period, the Receiver also liquidated substantially all of Bleidt's other personal property, including Bleidt's art collection, Steinway piano, furniture, certain computers and automobiles. The vast majority of this property other than Bleidt's automobiles was sold for \$29,123.38 at public auction on July 7, 2005. The auction was conducted by the Paul E. Saperstein Co., Inc. ("Saperstein"), who advertised the auction in the *Boston Globe, Boston Herald, Arts & Antiques Weekly* and on his own web page. The sale was also publicized through a direct mailing to approximately 400 potential buyers in a database maintained by Saperstein. A detailed accounting of the purchase price obtained for each lot of goods auctioned as well as the costs of the sale are attached hereto as Exhibit B.

21.    Bleidt's automobiles were sold for \$45,595.30 through private sales brokered by FAV, Inc. d/b/a R.C. Muirhead. Those vehicles, however, were subject to purchase money liens in the aggregate amount of \$18,714.37, yielding these estates a net recovery of \$26,880.93. A description of the vehicles and a detailed accounting of the amounts obtained for each vehicle is attached hereto as Exhibit C.

## C.    Receiver's Efforts to Negotiate a Global Settlement of Client-Victim Claims Against APAM's Broker-Dealers and Their Insurance Carriers

22.    Given the magnitude of Bleidt's fraud and the expected proceeds for the rescission of the Station Acquisition Agreement, any meaningful recovery by client-victims depends on recoveries from third parties. Based on the information developed to date, the Receiver has determined that (a) the resolution of investor claims against Bleidt's and APAM's former broker-dealers and their insurers, and (b) the estates' claims against the financial

8

providing legal services to this estate through the date of this status report. The accumulated but as yet unpaid fees due Nixon Peabody LLP now total in excess of $900,000. Copies of Nixon Peabody's invoices detailing all time and expenses claimed for that work and the nature of the services performed have been provided to, and reviewed by, counsel for the SEC. There continues, however, to be insufficient cash in this estate to pay these fees and expenses at this time, and the Receiver believes that the limited funds presently available to this estate are better spent at this time on other wind-up expenses. Nixon Peabody agrees with this assessment. Given the magnitude and aging of the accrued fees, however, the Receiver and Nixon Peabody expect to seek approval and payment of their reasonable fees and expenses within the next reporting period when funds are available from this estate to pay them, e.g., from the proceeds of the above-described transaction involving WBIX and/or settlements.

July 15, 2005                                    Respectfully submitted,

                                                 DAVID A. VICINANZO, RECEIVER

                                                 /s/Kevin M. Fitzgerald
                                                 Kevin M. Fitzgerald (admitted pro hac vice)
                                                 Steven N. Fuller (BBO #550224)
                                                 Francis C. Morrissey (BBO #567589)
                                                 Nixon Peabody LLP
                                                 100 Summer Street
                                                 Boston, MA 02110
                                                 (617) 345-1000

BOS1508867.6

# FREET JOURNAL.

*s & Company. All Rights Reserved*

05 - VOL. CCXLVI NO. 9 - ★★★★ $1.00          · · · · ·          **WSJ.com**

7/14/2005



Former WorldCom CEO Bernard J. Ebbers leaves court...

rt on
bility.
ng in
is at
aying
. His
, So-
y, the
a will-
e sur-
er po-
nom-
·tisan
ning a
udge;
recus-
Bush.
s hos-
3, A4)
ed on
porter.
ary in-
ment
short
vected.

sumed
bings.
near
r sus-
, dis-
ad be-
ry out

# Ebbers Is Sentenced to 25 Years
# For $11 Billion WorldCom Fraud

Bernard J. Ebbers, the 63-year-old founder and former chief executive of WorldCom Inc., was sentenced to 25 years in prison for orchestrating the biggest corporate accounting fraud in U.S. history.

Mr. Ebbers hung his head as Judge Barbara Jones sentenced him yesterday in U.S. District Court in Manhattan for fraud, conspiracy and making false filings. His shoulders shook as his lawyers and prosecutors discussed details.

At the end of the hearing, when he rose from the defense table, his eyes were red, his face sober. His wife, Kristie Ebbers, rushed into his arms, and the

couple embraced for several minutes. Both cried softly.

The former CEO is to report to prison on Oct. 12. Judge Jones said she would recommend that he serve his time at the low-security portion of a federal prison in Yazoo City, Miss., close to his home.

*By Dionne Searcey, Shawn Young and Kara Scannell*

There is no parole in the federal system, though convicts can cut their sentences by up to 15% for good behavior.

"I recognize this sentence is likely to be a life sentence," said Judge Jones. "But I find a sentence of anything less would not reflect the seriousness of this crime."

Mr. Ebbers, dressed in a dark suit and light blue tie, didn't speak to reporters after his sentencing. When asked by Judge Jones if he had anything to say, he indicated, in barely audible tones, that he didn't.

The sentence for Mr. Ebbers's conviction in the $11 billion fraud at WorldCom is the harshest yet given to an executive convicted in the recent wave of high-profile corporate scandals. That made it a key win for federal prosecutors in their push to crack down on corporate crime.

Yet the government also suffered a setback yesterday when prosecutors decided not to retry another former CEO, HealthSouth Corp. founder Richard M. Scrushy, on perjury charges that were dismissed before he was acquitted earlier this month on 36 other criminal counts. (See related article on page C3.)

In punishing Mr. Ebbers, Judge Jones said she believed federal guidelines called for a sentence of 30 years to life. But she cited Mr. Ebbers's charitable work in handing him 25 years.

Outside the courtroom, Reid Weingarten of Steptoe & Johnson LLP, the lead defense attorney for Mr. Ebbers said, "I think an innocent man got sentenced today. Bernie Ebbers was transformed into a symbol, a distorted picture of corporate corruption."

Mr. Ebbers continues to maintain that the fraud was committed by underlings without his knowledge. He is planning to appeal. Mr. Weingarten said. Judge Jones will decide later whether Mr. Ebbers can remain free while an appeal is being considered; attorneys not affiliated with the case estimated such an effort could take up to a year.

Legal observers underscored the severity of the penalty for a corporate crime. "It's a very drastic sentence," said George B. Newhouse Jr., an ex-federal prosecutor who heads the white-collar defense practice at law firm Thelen Reid & Priest LLP in Los Angeles.

Mr. Newhouse attributed the sentence to public outcry against corporate criminals, noting that it followed similarly tough penalties given to John Rigas, the 80-year-old founder of Adelphia Communications Corp., and his son Timothy Rigas, in the fraud at that company. They received sentences of 15 years and 20 years, respectively.

"These sentences," he said, "are commensurate with what you'd expect to see for people who commit egregious violent crimes, who take life."

Said Ellen Podgor, a law professor at Georgia State University College of Law: "We have never in our history seen sentences like this in white-collar cases. ...If these individuals had been sentenced 30 years ago, I wonder if

*Please Turn to Page A8, Column 4*

EXHIBIT "F"

# To 25 Years in Prison for WorldCom Fraud

Case 1:05-cr-10144-WGY   Document 28-7   Filed 11/29/2005   Page 2 of 3

Bernard J. Ebbers's sentence of 25 years puts him at the top of a list of recent...

*Continued From First Page*

tey would have gotten jail time."

Also yesterday, the Securities and Exchange Commission filed a civil fraud action against Mr. Ebbers for his role in the WorldCom fraud. Mr. Ebbers agreed to settle the matter by consenting, without admitting or denying anything, according to the SEC. He will be permanently barred from serving as an officer of a public company. The settlement is pending court approval, and the SEC said its investigation is ongoing.

More than 2.5 million investors are estimated to have lost money in the WorldCom fraud. How many millions—or billions—of dollars were lost has been a subject of intense debate, since the telecommunications industry as a whole was a meltdown well before WorldCom's fraud was disclosed. Investors who bought shares early in the fraud may have lost less as a direct result of the fraud than those who invested later, when more investment decisions likely were based on false information.

In all, WorldCom's fraud and bankruptcy wiped out a stock that was worth more than $180 billion at its peak in 1999—though it had lost considerable value before the company's 2002 collapse.

Earlier this month, Mr. Ebbers agreed to pay $5 million in cash and transfer nearly all his assets to a liquidation trust to settle a class-action suit filed by shareholders of WorldCom. The company, now a significantly smaller entity known as MCI Inc., recently agreed to be bought by Verizon Communications Inc.

The assets to be transferred, whose total value is estimated to be between $25 million and $40 million, include Mr. Ebbers's multimillion-dollar home in Brookhaven, Miss., a tax refund and numerous investments. He will be left with "certain amounts" to pay for legal bills, a modest living allowance and small house for his wife.

The sentencing punctuated the fall of a man who rose from being a Mississippi basketball coach and motel owner to heading what was considered to be a rising giant of the telecom industry during its peak in the late 1990s.

From a tiny Mississippi reseller of phone calls, WorldCom grew through a series of acquisitions to become the nation's second-largest long-distance company and a stock-market star of the boom market of the 1990s. Mr. Ebbers was celebrated on Wall Street as a brash but folksy CEO—especially after he pulled off what was then the biggest corporate takeover in U.S. history, the $37 billion purchase of MCI in 1997.

But by late 2000, a fraud was brewing beneath the surface, as WorldCom executives falsely boosted profits by marking operating expenses as capital spending, an improper practice. Underlings, including former Chief Financial Officer Scott Sullivan, testified Mr. Ebbers masterminded the fraud, ordering employees to "hit the numbers" and meet Wall Street expectations.

In 2002, Mr. Ebbers was forced out

assumed bank loans he had taken out. Two months later, the company announced it would restate financial results and lay off about 17,000 employees—the first public inkling of fraud. Soon it was in bankruptcy protection and under investigation by prosecutors and regulators.

By then, a crash was well under way for technology and telecom companies, as the industries struggled with heavy debt and overcapacity. Scores of small upstarts had failed, and even WorldCom had begun to sputter. The company had been among the big proponents of the view that Internet traffic was growing so rapidly that virtually no amount of spending and network-building was too much.

For nearly two years after the company's problems began, prosecutors were unable to charge Mr. Ebbers, in good part because the executive hadn't used email and left virtually no paper trail. Then, on the eve of Mr. Sullivan's trial in March 2004, the former chief financial officer agreed to plead guilty to three counts of securities fraud and testify against his former boss.

That enabled prosecutors to charge Mr. Ebbers that same month. Lead prosecutor David Anders built a case that relied heavily on the testimony of Mr. Sullivan.

During the trial that began in January, defense attorneys worked to tarnish Mr. Sullivan as he described what he said was Mr. Ebbers's role in leading the fraud. Ultimately, they decided to put Mr. Ebbers on the stand to respond himself, a possible tactical mistake. Jurors interviewed after the verdict in March said they couldn't reconcile Mr. Ebbers's insistence that he was unaware of the fraud with his image as a hands-on CEO.

Jones to consider Mr. Sullivan's role as the "mastermind" of the fraud and his eleventh-hour guilty plea. He said while he didn't want to "do anything that cranks up" Mr. Sullivan's sentence, the judge should make them comparable. Mr. Sullivan is to be sentenced on Aug. 4.

In asking for leniency, Mr. Weingarten invoked Mr. Ebbers's heart condition. During the trial, Mr. Ebbers said he suffers from cardiomyopathy, a serious condition in which the heart muscle doesn't pump blood properly.

Mr. Weingarten also cited his client's charity work, referring to 169 letters submitted to the court on Mr. Ebbers's behalf by friends, family and former colleagues. "I just don't think you can fairly read the 169 letters we submitted and conclude it is anything but extraordinary," he said.

Mr. Weingarten said most of Mr. Ebbers's more than $100 million in charitable giving was anonymous. "He wanted no self-aggrandizement," he said. "There are no plaques on the wall that say, 'This gym for disabled kids was built by Bernie Ebbers.'"

He described how Mr. Ebbers helped one child get into school when his family had financial hardship. "An angel appeared," Mr. Weingarten said. "He didn't know who he was. And the angel was Bernard Ebbers.

"If you live 60-some-odd years and you have an unblemished record, doesn't that count, particularly on this day?" he asked.

Judge Jones said she was impressed by the letters. But, she said, "Mr. Ebbers created the fraud that caused a number of investors to suffer losses....This fraudulent scheme defrauded the market as a whole as well. It seems quite clear to me

## Name, Company / Charges / Sentence

| Name, Company | Charges | Sentence |
|---|---|---|
| Bernard J. Ebbers, WorldCom | Fraud; conspiracy; false filings[1] | 25 years |
| Jamie Olis, Dynegy | Fraud; conspiracy[1] | 24 years 4 months |
| Timothy Rigas, Adelphia Communications | Fraud; conspiracy[1] | 20 years |
| John Rigas, Adelphia Communications | Fraud; conspiracy[1] | 15 years |
| Andrew Fastow, Enron | Pleaded guilty to conspiracy to commit securities fraud | 10 years[2] |
| Martin Grass, Rite Aid | Pleaded guilty to conspiracy charges | 8 years[2] |
| Sam Waksal, ImClone Systems | Pleaded guilty to insider trading | 7 years[2] |
| Frank Quattrone, Credit Suisse First Boston | Obstruction of justice; witness tampering[1] | 18 months |
| Martha Stewart, Martha Stewart Living Omnimedia | Conspiracy, obstruction of justice[3] | Five months prison; five months home confinement[3] |

### Awaiting Sentencing

| | | |
|---|---|---|
| Scott Sullivan, WorldCom | Pleaded guilty to fraud charges | Faces maximum of 25 years[4] |
| L. Dennis Kozlowski, Tyco International | Grand larceny; conspiracy; securities fraud; falsifying business records[1] | Faces maximum of 30 years[4] |

[1]Appealing or planning to appeal conviction. [2]Sentence conditioned upon his continued cooperation with prosecutors. [3]Scheduled to be resentenced following successful appeal of sentence. [4]Appealing sentence in wake of Supreme Court ruling on federal sentencing guidelines.

Ebbers could receive treatment for his heart condition in prison.

As yesterday's hearing ended, Mr. Ebbers remained still while bailiffs cleared the courtroom. He stood, slightly hunched, at the defense table, turning away as best he could from the crowd in the courtroom.

A few minutes later, after the courtroom had been cleared, Mr. Ebbers, his wife and members of the defense team walked quietly out a side door and headed down the stairs to the street. Bailiffs prevented people from following or approaching.

Mr. and Mrs. Ebbers appeared subdued as they covered the few steps from the door to the stairwell.

 **Question of the Day:** *Did former WorldCom CEO Bernard*